# Illinois Official Reports

## Appellate Court

---

*In re L.S.*, **2014 IL App (4th) 131119**

---

| | |
|---|---|
| Appellate Court Caption | In re: L.S., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. SHYLA STOPPELWERTH, Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-13-1119 |
| Filed | May 16, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Respondent's minor child was properly adjudicated neglected and abused based on evidence that the child appeared on a live-feed webcam with respondent and respondent's paramour while being sexually abused. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 13-JA-4; the Hon. Steven H. Nardulli, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Sara M. Mayo (argued), of Law Offices of Sara M. Mayo, of Springfield, for appellant.<br><br>John Milhiser, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and James C. Majors (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Appleton and Justice Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1     In January 2013, the State filed a petition for adjudication of wardship pursuant to section 2-3 of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2-3 (West 2012)), alleging that L.S. (born July 26, 2009), the minor child of respondent, Shyla Stoppelwerth, was neglected and abused.

¶ 2     At an October 2013 hearing on the petition, Sheriff's Deputy Raymond Briant of Broward County, Florida, testified that while he was off duty on a family vacation in Tennessee in December 2012, he used an application on his iPad to watch several publicly viewable, live-feed webcams. One such webcam, listed under the name "Shyla," appeared to show a young boy and a female in a bed with an adult male, who was watching child pornography and masturbating. The young boy also appeared to perform oral sex on the male. Briant, who did not know the identity or location of the parties shown on the Shyla webcam, reported what he saw to the National Center for Missing and Exploited Children (NCMEC), the Federal Bureau of Investigation (FBI), and the Ireland-based private company that administered the webcam service. The FBI traced the source of the webcam to a house where respondent and L.S. were living with respondent's paramour, Craig Long.

¶ 3     At the October 2013 hearing, respondent admitted that she, L.S., and Long were the persons appearing on the Shyla webcam. Over respondent's objection, the trial court admitted into evidence (1) Briant's testimony about what he viewed on the Shyla webcam and (2) 12 still images automatically archived from the webcam by the company that administered the webcam service. Based primarily upon the evidence from the Shyla webcam, the court adjudicated L.S. abused and neglected.

¶ 4     Respondent appeals, arguing that (1) the trial court erred by admitting (a) Briant's testimony about what he viewed on the Shyla webcam and (b) the still images captured from the webcam, and (2) the court's adjudication of abuse and neglect was against the manifest weight of the evidence. We affirm.

¶ 5                                    I. BACKGROUND

¶ 6     The State's January 2013 petition alleged that L.S. was (1) neglected pursuant to section 2-3(1) of the Act (705 ILCS 405/2-3(1) (West 2012)) in that his environment was injurious to his welfare, as demonstrated by his mother's allowing him to be sexually abused; and (2) abused pursuant to section 2-3(2) of the Act (705 ILCS 405/2-3(2) (West 2012)) in that he was sexually abused by his mother's paramour. That same month, the trial court entered a shelter-care order, placing L.S. in the custody of respondent's aunt, Sheryl Stoppelwerth.

¶ 7        Later in January 2013, Sheryl filed a petition for guardianship in the juvenile case at issue in this appeal (Sangamon County case No. 13-JA-4). In September 2013, the trial court ordered case No. 13-JA-4 consolidated with an order of protection case (Sangamon County case No. 13-OP-24), which Sheryl filed against respondent on behalf of L.S.

¶ 8                              A. The Hearing on the State's Petition
¶ 9        In October 2013, the trial court held a consolidated hearing on the State's petition for adjudication of abuse and neglect, Sheryl's petition for guardianship, and Sheryl's order of protection. (For purposes of this appeal, we review only the evidence pertinent to the State's petition.)

¶ 10                                  1. *Briant's Testimony*
¶ 11       Briant testified that on December 5, 2012, he was on an annual family vacation in Gatlinburg, Tennessee. Several days prior to leaving for his trip, he downloaded to his iPad an application known as "My Webcam," which allowed him to view a live webcam feed from the inside of his home while he was away. Briant set up the webcam so that he and his children could monitor their house cats while they were on vacation. Briant set his home webcam to "private" mode, which meant that only he could view the webcam feed. However, Briant testified that hundreds of webcams on the My Webcam service were set to "public" mode, which meant that anyone using the My Webcam service could view the live feed from those webcams.

¶ 12       Over respondent's continuing objection, Briant testified that while using the My Webcam application, he decided out of curiosity to view some of the public webcams. One of the public webcams, listed under the name "Shyla," showed what initially appeared to Briant to be two juveniles in a bed with an adult male, who was masturbating. Briant testified that one of the apparent juveniles was a young boy, approximately five or six years old, with light brown to blondish hair, and wearing a green shirt. The other juvenile appeared to be an older, blonde female. (At the hearing, Briant identified that person as respondent.) Briant described the adult male as having black, crew-cut type hair and a large "tribal" tattoo on his left arm.

¶ 13       Briant, believing that he was watching "something illegal occurring" and fearing for the welfare of the juveniles, sent multiple e-mails to the Ireland-based company that owned and administered the webcam service, describing what he saw. The company responded to Briant via e-mail, informing him that "they would do whatever they can to forward whatever they could to the authorities." Briant also sent e-mails to the FBI and the NCMEC. In the e-mails, Briant described exactly what he saw on the Shyla webcam.

¶ 14       While Briant was attempting to contact authorities, he continued to view the Shyla webcam in order to "help identify where this was, who these people were." Briant then "saw the adult male watching what appeared to be child pornography on his laptop as the little boy came around to the side of the bed and performed what appeared to be oral sex on that adult male." On cross-examination, Briant elaborated about what he saw: "What I saw was the child shown child pornography, the child's, then, head descending over the man's penis, and the man giving back a sippy cup to the young boy after what appeared to be oral sex." After the adult male handed the sippy cup to the young boy, the live feed "seemed to cut out." During the entire 5 to

10 minutes that Briant viewed the Shyla webcam, respondent appeared to be awake, either walking around the room or lying in the bed with the adult male and the young boy.

¶ 15    Briant testified that the video had good clarity and appeared to be working the entire time. He knew he was watching a live feed because the same webcam service allowed him to view a live feed inside his home. Briant also knew from his use of the webcam service that it "archived" images from the webcam feeds. Someone viewing a public webcam could peruse that webcam's archive, which showed still images that had been automatically captured from the webcam feed every 5 minutes during the previous 24 hours. Briant looked at the archive of the Shyla webcam, which revealed several still images of the same persons in the same room that Briant was viewing on the live feed.

¶ 16                    *2. Jackie Lynn's Testimony*

¶ 17    Detective Jackie Lynn, a child-abuse investigator with the Kansas City, Kansas, police department, testified that on or about December 5, 2012, the FBI received a "cybertip" via the NCMEC that the Shyla webcam on the My Webcam service had shown an adult male engaging in a sex act with a juvenile boy. Pursuant to that tip, the FBI determined the Internet Protocol (IP) address associated with the Shyla webcam. The FBI then obtained subpoenas for the cable carrier and Internet service provider associated with the IP address, which led investigators to a house in Kansas City, Kansas. Based upon Briant's description and photographs obtained through existing law-enforcement contacts, the FBI identified Craig Long as the adult male whom Briant saw on the Shyla webcam.

¶ 18    The FBI also obtained a subpoena for the Ireland-based company that owned and administered the My Webcam service. (During her testimony, Lynn referred to this company as "eyespyfx.com." For convenience, we refer to the company simply as "Eye Spy.") Lynn testified that Eye Spy's system automatically saved a still image from all My Webcam webcasts every five minutes. Eye Spy normally archived those images for only 24 hours before purging them from its server system. However, after Briant contacted Eye Spy, Eye Spy immediately saved the existing images in the Shyla webcam archive. Lynn testified that she learned the aforementioned information about the investigation by reviewing materials provided to her by the FBI Cybercrime Taskforce in Kansas City.

¶ 19    On December 21, 2012, the FBI requested that officers from Lynn's department provide backup to the house in Kansas City, Kansas, where the Shyla webcam was supposedly located. After arriving at the house with other officers, Lynn met with the homeowners. (Lynn did not identify the homeowners by name in her testimony.) The homeowners confirmed that Long stayed in their basement on occasion. Lynn told the homeowners that they should not tell Long that law-enforcement agents were searching for him.

¶ 20    Lynn then obtained a search warrant to track Long's cellular phone through Sprint, his mobile carrier. In early January 2013, after several days of tracking Long (during which Long repeatedly powered down his cellular phone, defeating efforts to pinpoint his location), officers in Callaway County, Missouri, discovered Long's vehicle outside a home that Lynn identified as one of Long's previously known addresses. Lynn and other officers obtained and executed a search warrant for the residence, which resulted in the apprehension of Long and respondent. The search failed to uncover Long's laptop computer or cellular phone, which Long claimed had been stolen from his car. Respondent told Lynn that Long had destroyed his laptop.

¶ 21　　　During the execution of the search warrant, Lynn showed respondent the archived images from the Shyla webcam. (Although the FBI obtained the same archived images through a subpoena, a representative from Eye Spy–whom Lynn referred to as Mr. Gallagher–voluntarily e-mailed the same set of images to Lynn upon her request.) Respondent confirmed to Lynn that the images showed her, Long, and L.S. After speaking with respondent in Callaway County, Lynn learned that L.S. was staying with Sheryl in Springfield, Illinois. Before L.S. began staying with Sheryl, he was living with respondent and Long.

¶ 22　　　　　　　　　　　　3. *Still Images From the Shyla Webcam Archive*

¶ 23　　　The trial court admitted into evidence 12 still images from the Shyla webcam archive. Each image bore a digital timestamp showing the time the image was captured from the live feed. The timestamps indicate that the Shyla webcam was streaming during four separate periods between 11:21 a.m. on December 5, 2012, and 4:31 a.m. on December 6, 2012 (although the timestamps show the time in hours, minutes, and seconds, we round to the nearest minute for convenience). The webcast that Briant viewed occurred between approximately 9:21 p.m. and 9:51 p.m. on December 5, 2012. We provide the following overview of the contents of the images, which are in the record before us.

¶ 24　　　It appears that the position and orientation of the webcam is the same for all 12 images. The webcam is positioned alongside and facing a bed. Beyond the bed is an open room illuminated by ceiling lights. The lighting in the room is good, and the images are fairly sharp.

¶ 25　　　Seven images captured between 9:06 p.m. and 9:51 p.m. on December 5, 2012, show respondent, L.S., and Long together in the bed. In some of the images, Long is lying on his back with a laptop on his belly, and his head is outside of the frame. He appears to be masturbating. Long is wearing boxer-brief type shorts, but his hand is gripping a flesh-colored object at the base of his crotch. Because Long's hand and the flesh-colored object are significantly blurred, whereas the rest of the objects in the image are crisp, it appears that his hand is in motion. In two such images, L.S. is clearly awake. His eyes are open, and he is lying immediately next to Long on the bed.

¶ 26　　　In the image captured at 9:21 p.m., the laptop screen–oriented at a slight angle just visible to the webcam–is opened to a full-screen media player. Although the image on media player is difficult to make out, it clearly includes flesh-colored body parts. Long's hand is at the base of his crotch. Although the faces of Long and L.S. are outside of the frame, L.S.'s right arm is clearly visible immediately next to Long and raised slightly in the air, indicating that he is awake.

¶ 27　　　The image captured at 9:26 p.m. shows Long apparently masturbating, respondent lying in the bed with her eyes closed, and L.S. lying awake in between respondent and Long. The image captured at 9:31 p.m. shows Long apparently masturbating with L.S. next to him, but respondent is no longer in the bed. The image captured at 9:36 p.m. shows Long lying on his right side facing the center of the bed, with his back to the webcam. His hand is at his crotch, and respondent's red shorts can be seen next to him in the bed. The image captured at 9:41 p.m. shows Long sitting upright on the bed with his back to the webcam, respondent awake lying on her side, and L.S. sitting upright playing on a tablet computer. Long and respondent appear to be talking with L.S. The next image, captured at 9:51 p.m., shows Long apparently masturbating again, with the laptop on his belly. Respondent and L.S. are not visible in the image.

#### 4. *Roger Washington's Testimony*

Roger Washington, a child abuse and neglect investigator with the Department of Children and Family Services (DCFS), testified that he was assigned to the case involving L.S. in early January 2013. During the investigation, respondent told Washington that Long was her boyfriend, but she denied having any knowledge of Long sexually abusing L.S.

#### 5. *Sheryl's Testimony*

Sheryl, the aunt of respondent and great-aunt of L.S., testified that L.S. had been living with her from January 1, 2013, until the date of the hearing. Sheryl identified respondent and L.S. as the female and young boy shown in the images from the Shyla webcam archive.

#### 6. *Respondent's Testimony*

Respondent testified that she was in a relationship with Long from 1999 until 2007. After ending her relationship with Long in 2007, she began a relationship with Jason Reels, the father of L.S. (Reels failed to appear at the proceedings in this case, and he is not a party to this appeal.) In 2012, respondent resumed her relationship with Long, bringing L.S. to Missouri to live with Long. Respondent testified that Long had a loving relationship with L.S., and she had no reason to believe that Long was a child sex offender. After a friend in Kansas City told her that the police were searching for Long, respondent left L.S. at Sheryl's home in Springfield. She did not want L.S. present "if the door were to get kicked in." Respondent testified that she believed the police were searching for Long because he had illegally downloaded nonpornographic movies from the Internet. Respondent confirmed that Long destroyed his laptop computer and cellular phone after learning the police were searching for him.

Respondent acknowledged that she was in the images obtained from the Shyla webcam archive, but she denied ever witnessing Long (1) masturbate in the presence of L.S, (2) view child pornography, or (3) put his penis in L.S.'s mouth. She did not believe that Long forced L.S. to perform oral sex, but she admitted that it appeared from the webcam images that Long masturbated in the bed with L.S. Respondent testified that she takes trazodone for sleep, and she had "no knowledge of what took place" because she was sleeping at the time. However, after reviewing the images from the Shyla webcam one by one on cross-examination, respondent acknowledged that she was not asleep during the time that Long allegedly masturbated in the presence of her and L.S. She continued to insist that she had no knowledge of Long masturbating in the presence of L.S.

Respondent did not believe that Long purposefully did anything wrong. She testified: "I don't think that [Long] meant [L.S.] any harm, and I don't think he did any harm to [L.S.]" Despite denying the allegations against Long, respondent nonetheless ended her relationship with Long because of the seriousness of the allegations.

### B. The Trial Court's Ruling

At the conclusion of evidence and arguments, the trial court announced its ruling, as follows:

> "First, with regards to the State's petition, I find that the State has established by any measure of proof that [L.S.] was sexually exploited and abused, [and] that [respondent]

was present at that time. I specifically find that [respondent's] testimony that she did not know what was going on at that time is incredible and not worthy of belief. I find that [Briant] *** was very credible, he's a law enforcement [officer] who's trained to observe, and thank goodness, quite frankly, that he happened upon this streaming webcam at that time, because otherwise, this may never have been discovered. I find that it's incredible when [respondent] says that she did not know what was going on in that bed. Particularly, on her cross-examination, she's acknowledged that that was her, that that was [L.S.], that was her boyfriend. She acknowledges that she was awake, she acknowledges that it appears–and that he probably was masturbating, and yet, she still didn't think there was anything going on that's harmful to her child. On some level it's almost beyond the realm of belief."

¶ 38   The trial court adjudicated L.S. (1) neglected under section 2-3(1) of the Act in that respondent allowed him to be sexually abused by Long, and (2) abused under section 2-3(2) of the Act in that he was sexually abused by Long.

¶ 39   In November 2013, following a dispositional hearing, the trial court made L.S. a ward of the court and awarded custody and guardianship to DCFS. (The court took Sheryl's petition for guardianship under advisement.)

¶ 40   This appeal followed.

¶ 41                                  II. ANALYSIS

¶ 42   On appeal, respondent argues that (1) the trial court erred by admitting (a) Briant's testimony about what he viewed on the Shyla webcam and (b) the still images captured from the Shyla webcam, and (2) the court's adjudication of abuse and neglect was against the manifest weight of the evidence. We address respondent's contentions in turn.

¶ 43                            A. The Webcam Evidence

¶ 44   "The admissibility of evidence rests within the discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion." *People v. Pikes*, 2013 IL 115171, ¶ 12, 998 N.E.2d 1247. "Under this standard, an abuse occurs when the trial court's ruling is fanciful, unreasonable or when no reasonable person would adopt the trial court's view." *People v. Taylor*, 2011 IL 110067, ¶ 27, 956 N.E.2d 431.

¶ 45   Respondent argues that the "silent witness" theory governs the admissibility of both (1) Briant's testimony about what he viewed on the Shyla webcam and (2) the still images from the Shyla webcam archive. The silent witness theory allows for the admission of photographs and video recordings as substantive evidence if the proper foundation is laid. *Id.* ¶ 32, 956 N.E.2d 431. "Under this theory, a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation." *Id.*

¶ 46   In *Taylor*, a criminal case involving a theft captured on a hidden surveillance camera, the supreme court endorsed the following nonexhaustive list of factors for determining the reliability of the process by which a surveillance videotape was produced:

> "(1) the device's capability for recording and general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or

objects depicted; and (6) explanation of any copying or duplication process." *Id.* ¶ 35, 956 N.E.2d 431.

The court stated, however, that "[e]ach case must be evaluated on its own" and "[t]he dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Id.*

¶ 47                    1. *The Still Images From the Webcam Archive*

¶ 48    In this case, the photographic evidence at issue consisted of 12 still images that Eye Spy automatically captured and archived from the live video feed of the Shyla webcam. Lynn testified that those digital images were stored on Eye Spy's server system, then e-mailed to her by Gallagher, a representative of Eye Spy. The images were then printed onto individual sheets of glossy photographic paper and offered into evidence as individual exhibits. Briant viewed the 12 exhibits and confirmed that the still images depicted the same scene that he observed on the live video feed from the Shyla webcam on December 5, 2012. He also confirmed that the images were the same still images he viewed in the Shyla webcam archive on December 5, 2012. Respondent viewed the same exhibits and confirmed that they depicted her, L.S., and Long in the basement of the Kansas City house where they were living in December 2012.

¶ 49    Respondent asserts that the State failed to present evidence about the (1) equipment used for the Shyla webcam, (2) competency of the operator, (3) proper operation of the webcam, (4) chain of custody of the images, and (5) copying or duplication process. However, none of that evidence was necessary because of (1) respondent's admissions and (2) Briant's testimony. Respondent's admissions established that the images showed her, L.S., and Long, demonstrating the accuracy and reliability of the process used to create the images. Respondent has not argued that the images are visually misleading, or that they have been altered in any way. Thus, considering respondent's testimony, as well as Briant's (discussed in the next section of this opinion), we conclude that the trial court did not abuse its discretion by admitting the 12 images from the Shyla webcam archive into evidence.

¶ 50                                2. *Briant's Testimony*

¶ 51    Contrary to respondent's argument, the silent witness theory does not apply to Briant's testimony about what he viewed on the live feed of the Shyla webcam because Briant's testimony was not a video recording. Indeed, no video recording of what Briant witnessed has ever existed. Because the silent witness theory applies to photographs and video recordings–evidence that "speaks for itself" (internal quotation marks omitted) (*id.* ¶ 32, 956 N.E.2d 431)–the testimony of a witness who sees events unfold live and in real time must be evaluated on its own terms, even if that eyewitness account occurred through video technology.

¶ 52    Because the evidence here consisted of an eyewitness account, as opposed to a recording, the admissibility determination hinged on whether Briant was able to truly and accurately observe what was happening on the source end of the webcast. In other words, did the technology at issue transmit live video to Briant's iPad that truly and accurately depicted what was happening in the Kansas City basement? Based upon the evidence presented, it clearly did. Specifically, respondent confirmed that she, L.S., and Long were the people in the still images archived from the Shyla webcam, and Briant testified that those still images corresponded with

the live webcast that he viewed on his iPad on December 5, 2012. The timestamps on the still images corresponded to the times that Briant viewed the webcast. Briant also positively identified respondent in court as the woman whom he saw on the webcast. Briant testified that the live video stream had good clarity and appeared to be working properly during the entire webcast. He was able to clearly observe what was happening in the bedroom.

¶ 53      The State was not required to present evidence as to the workings of the specific pieces of electronic equipment that facilitated the webcast. Just as a witness may testify about what he heard during a telephone conversation without explaining how a telephone works, Briant's testimony was admissible even though the State did not present evidence explaining how the digital technology worked. Briant's familiarity with My Webcam was enough to establish that the Shyla webcam was a live feed–a fact that respondent does not contest. Unlike evidence admitted under the silent witness theory, no issue existed as to the process of recording, saving, preserving, or duplicating the video from the webcast because no video recording existed. Instead, this situation was as if Briant witnessed the events unfold through a high-tech periscope.

¶ 54      Despite the complete lack of evidence suggesting that the webcast Briant viewed showed anything other than what actually happened in the Kansas City basement, respondent argues that the State was required to present testimony (and perhaps even expert testimony) regarding the equipment and software used to facilitate the webcast–from Long's webcam, to Eye Spy's servers in Ireland, to Briant's iPad, and every electronic step along the way. Respondent asserts that because technology exists that could have enabled Long–or some other unknown person–to manipulate digital video and somehow pass it off as a live webcam feed on the My Webcam service, Briant's testimony was inadmissible unless the State presented evidence proving that no such mischief occurred.

¶ 55      Contrary to respondent's argument, the *mere possibility* of tampering–unsupported by any evidence of tampering–did not render Briant's testimony inadmissible. In *People v. Woods*, 214 Ill. 2d 455, 467, 828 N.E.2d 247, 255 (2005), the supreme court addressed the requirement that the State establish a chain of custody in cases involving narcotics, where physical evidence "is often not readily identifiable or may be susceptible to tampering, contamination or exchange." Even when evidence so vulnerable to tampering is involved, "[o]nce the State has established the probability that the evidence was not compromised, and unless the defendant shows actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not admissibility, of the evidence." (Internal quotation marks omitted.) *Id.*

¶ 56      Here, even if the strict chain-of-custody requirements applicable to narcotics were to apply to the webcast that Briant viewed, Briant's testimony would still be admissible. The probability that the video was not compromised was evident from (1) Briant's testimony about the My Webcam service, (2) the circumstances under which Briant viewed the webcast, and (3) the contents of the webcast itself. Respondent presented no evidence of tampering, nor did she even posit why or how anyone–especially Long–would have employed Hollywood-style video-manipulation skills and advanced computer hacking to create and stream a fictitious webcast purporting to show Long masturbating in bed with L.S. Respondent's assertion that such a possibility existed went–at most–to the weight of Briant's testimony, not its admissibility.

¶ 57      We acknowledge that it is possible a case might arise in which a foundational explanation of the technology involved might be necessary before a witness testifies about what he

observed over a live webcast or other similar live video feed. However, that is not this case, and we need not speculate about hypothetical cases. On the facts of this case, the evidence established that the technology involved allowed Briant to truly and accurately observe what was happening at the source end of the webcast. Accordingly, the trial court did not abuse its discretion by admitting Briant's testimony about what he viewed on the Shyla webcam.

¶ 58                                B. The Trial Court's Adjudication

¶ 59        Respondent next contends that the trial court's adjudication of abuse and neglect was against the manifest weight of the evidence. Specifically, respondent argues that (1) she was not aware of, or at fault for, the sexual abuse that Long may have inflicted on L.S.; (2) the court erred by admitting and considering evidence from the Shyla webcam; and (3) even if the evidence from the Shyla webcam was properly admitted, the court gave it too much weight. None of these arguments are remotely persuasive.

¶ 60        A trial court's finding that a minor has been neglected or abused under section 2-3 of the Act will not be reversed unless it is against the manifest weight of the evidence. *In re Arthur H.*, 212 Ill. 2d 441, 464, 819 N.E.2d 734, 747 (2004). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 61        In this case, the trial court found that the State proved L.S. (1) neglected under section 2-3(1) of the Act in that his environment was injurious to his welfare because respondent allowed him to be sexually abused and (2) abused under section 2-3(2) of the Act because he was sexually abused by Long.

¶ 62        As this court has consistently stated, " ' "the purpose of juvenile court proceedings is to determine the *status* of the child on whose behalf the proceedings are brought, *not* to determine any particular person's criminal or civil liability." ' " (Emphases in original.) *In re C.J.*, 2011 IL App (4th) 110476, ¶ 41, 960 N.E.2d 694 (quoting *In re J.W.*, 386 Ill. App. 3d 847, 854, 898 N.E.2d 803, 809 (2008), quoting *In re R.B.*, 336 Ill. App. 3d 606, 614, 784 N.E.2d 400, 407 (2003)). Accordingly, even if respondent was not aware of, or at fault for, Long's sexual abuse of L.S., her lack of knowledge or culpability would not affect the validity of the trial court's findings of neglect and abuse. In any event, the court *did* find that respondent was aware Long masturbated in the presence of L.S., and this finding was amply supported by the evidence. The court explicitly found respondent's contrary testimony incredible, a conclusion fully supported by this record. Notably, respondent does not dispute that Long sexually abused L.S.

¶ 63        Having already determined that the trial court properly admitted the evidence from the Shyla webcam, we necessarily reject respondent's argument that the court erred by considering that evidence. We also reject respondent's argument that the court gave too much weight to the evidence from the Shyla webcam. Briant's testimony, which the court found particularly credible, and the 12 images from the webcam archive established that respondent was present and awake while Long was (at the very least) masturbating in the presence of L.S. Briant also testified that Long showed child pornography to L.S. and made L.S. perform oral sex. This evidence clearly established that L.S. was neglected and abused. Accordingly, the court's finding was not against the manifest weight of the evidence.

¶ 64                                    III. CONCLUSION

¶ 65            For the reasons stated, we affirm the trial court's judgment.

¶ 66            Affirmed.