NOTICE

Decision filed 01/18/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220545-U

NO. 5-22-0545

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* J.H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-JA-56 |
| | ) | |
| Charles H., | ) | Honorable |
| | ) | Matthew D. Lee, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court's findings that respondent father was an unfit parent and that termination of his parental rights was in the minor's best interest were not against the manifest weight of the evidence.

¶ 2   Respondent, Charles H., appeals from the judgment of the circuit court of Champaign County terminating his parental rights to his biological minor child, J.H. On appeal, Charles H. raises four issues. First, Charles H. argues that the court erred by finding the proffered testimony of the limited guardian *ad litem* in a previous family law case, Cynthia Morgan, irrelevant. Second, Charles H. argues that the Center for Youth and Family Services (hereinafter CYFS) failed to provide effective services, impeding Charles H. in his efforts to make reasonable progress toward reunification. Third, Charles H. argues that the court misinterpreted the standard by which "reasonable progress" is measured. Finally, Charles H. argues that the court's best-interests

1

determination was against the manifest weight of the evidence. For the following reasons, we disagree with Charles H., and we affirm the judgment of the circuit court.

¶ 3                                    I. Background

¶ 4      Charles H. had one child, J.H., born on October 26, 2010. The Illinois Department of Children and Family Services (hereinafter DCFS) took protective custody of J.H. on July 20, 2020.

¶ 5      On July 21, 2020, the State filed a two-count petition for adjudication of neglect, alleging that J.H. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)), because J.H.'s environment was injurious to his welfare when he resided with mother, Laura, due to exposure to domestic violence (count I) and substance abuse (count II).[1]

¶ 6      A shelter care hearing report filed on July 21, 2020, noted that on July 2, 2020, a domestic violence incident took place at the residence of Laura with J.H. present. J.H. witnessed an argument among four adults and witnessed Laura's paramour[2] slap her in the face. Two other adults hit and scratched Laura, and a physical altercation took place between all four adults. On July 19, 2020, DCFS received a new report that J.H. offered additional information about the altercation. J.H. reported that Laura's paramour retrieved a gun and pointed it at Laura.

¶ 7      A child protection advanced specialist (hereinafter CPAS) reported that she contacted J.H. and Laura on July 7, 2020. Laura disclosed that there was a physical altercation; however, she denied that J.H. witnessed it. Laura admitted to using marijuana and disclosed lacing marijuana with cocaine. However, she reported that she did not use substances around J.H. A drug screening returned a positive test for cocaine but not marijuana.

---

[1]Mother, Laura, is not a party to this appeal. As such, this order focuses solely on the evidence and rulings related to father, Charles H.

[2]We note that father, Charles H., was not the paramour during the altercation.

2

¶ 8    CPAS met with J.H. on July 20, 2020. J.H. reported that he witnessed the altercation between his mother, her paramour, and roommates. J.H. reported that a firearm was involved. J.H. reported that mother smoked "white stuff" out of a glass tube. J.H. reported that he "caught her in the act" of using. J.H. reported that he witnessed his mother selling "green stuff in a baggie." J.H. reported that his mother's paramour stored and sold guns and drugs from the home.

¶ 9    Father, Charles H., wished to take protective custody of J.H. However, CPAS determined that placement with Charles H. was not in the best interest of J.H., given Charles H.'s prior Illinois DCFS history, including a "death by neglect" case.

¶ 10    CPAS noted a substantial history report for Charles H., which included: a 2006 indication on death by neglect, bone fractures, cuts, welts, bruises, oral abrasions, medical neglect, and malnutrition; a 1995 indication on risk of harm, cuts, welts, abrasions, and oral injuries; a 1999 indication for medical neglect; a 2000 indication for substantial risk of harm, cuts, bruises, welts, abrasions, and oral injuries to two uninvolved children; a 2001 indication on substantial risk of harm to uninvolved child; a 2001 indication on substantial risk of harm to noninvolved parent; a 2002 indication for medical neglect, bone fractures by neglect, and substantial risk of physical injury/environment injurious to health and welfare; and a 2003 indication for substantial risk of physical injury/environment injurious to health and welfare to uninvolved child.

¶ 11    Additionally, Charles H. had a substantial criminal history, including assault, larceny, burglary, public peace, traffic, forgery, obstructing justice, dangerous drugs, weapons offenses, and damage to property. At the time of the report, Charles H.'s most recent arrest was in January 2019 for possession of a weapon by a felon, gang activity, and cannabis trafficking. Charles H. also had a no contact stalking order from September 2018 through November 2018. The shelter care report noted that, based on Charles H.'s extensive DCFS history, there were concerns with

his ability to successfully parent J.H. in a safe environment and without intervention, given the nature of his prior reports.

¶ 12    On July 21, 2020, the circuit court entered a temporary custody and admonition order finding J.H. neglected. The parties stipulated to the entry of an order of temporary custody. Temporary custody of the minor was placed with DCFS.

¶ 13    On October 20, 2020, the circuit court held an adjudicatory hearing.[3] Following the hearing, the court entered an adjudicatory order finding J.H. neglected.

¶ 14    On November 9, 2020, Jamie Buskirk, a foster care family worker with CYFS, filed a dispositional report. The report noted that Charles H. was not the indicated perpetrator in the investigation, but presented mental health concerns, substance abuse, and a lengthy history of poor parenting resulting in previous DCFS involvement, for which he did not complete corrective services. Charles H. presented a criminal history as recently as 2019. The report noted that Charles H. had a documented history of perpetrating physical abuse with two of his other children, one of whom died from the effects of prolonged abuse and neglect. The report noted that Charles H. failed to see the relevance of his prior behaviors and history of abusive and neglectful parenting on his current parenting abilities. Charles H. admitted to the caseworker that he used marijuana daily.

¶ 15    On November 18, 2020, the circuit court filed a dispositional order finding it in the best interest of J.H. that the minor be made a ward of the court and adjudged neglected. In support thereof, as to Charles H., the court noted that father was indicated in 2006 and 2012 for physical abuse, had sporadic contact with the minor, and has not had a significant caretaker role for the minor. Moreover, Charles H. had a significant criminal history.

---

[3]There is no report of the proceedings for any hearing prior to the hearing on parental unfitness, held on April 4, 2022.

4

¶ 16　　On February 23, 2021, DCFS filed a permanency hearing report. The service plan indicated that Charles H. failed to appear for numerous drug screenings, and he tested positive for tetrahydrocannabinol and opiates on December 13, 2020. The DCFS service plan rated Charles H. satisfactory for being cooperative in scheduling and attending meetings with CYFS and signing consents. Charles H. was unsatisfactory for scheduled weekly visits. The report noted that Charles H. attended one supervised visit on August 24, 2020, which went well. However, Charles H. ended the visit early for an appointment. At the following visit, the worker transporting J.H. was late. Charles H. became upset and verbally aggressive with staff. At the next visit, J.H. became upset when the worker arrived to pick him up. J.H. cried and expressed a desire not to see his father. CYFS cancelled the visit. The worker was unable to reach Charles H., but Charles H. failed to show for the visit anyway. Since that time, J.H. refused visits with his father, stating he is fearful of Charles H.

¶ 17　　Charles H. was also unsatisfactory for notifying CYFS at least 24 hours in advance if a visit needed to be cancelled. The caseworker noted that Charles H. ended his first two visits early without prior notice and he missed the third meeting altogether. J.H. since refused visits.

¶ 18　　Charles H. was unsatisfactory for failing to complete parenting courses. He was, however, satisfactory for signing consents and engaging in counseling services.

¶ 19　　The circuit court entered a permanency order on March 1, 2021. The court determined that Charles H. had not made reasonable efforts toward returning the minor home. Additionally, the court determined that Charles H. had not made reasonable and substantial progress toward returning the minor home.

¶ 20　　On May 25, 2021, DCFS filed a permanency hearing report. The report noted that Charles H. was not satisfactory toward the goal of return home for either progress or efforts. Charles H.

failed to appear for drug screens during the reporting period. Charles H. did not engage in treatment for substance abuse. Charles H. initially attended counseling services but ultimately was unsuccessfully discharged due to lack of attendance. Charles H. failed to engage in domestic violence and parenting classes. The report noted that J.H. and Charles H. began virtual visitation for one hour every other week. Only one visit occurred.

¶ 21    On June 1, 2021, the circuit court entered a permanency order setting the goal as return home within 12 months. The court found that Charles H. made reasonable efforts toward returning the minor home, but he did not make reasonable and substantial progress toward returning the minor home. The court noted that Charles H. missed drug screens and visitation, and he needed to complete his service plan.

¶ 22    On November 23, 2021, DCFS filed a permanency report. The report noted that father failed to attend any scheduled drug screens. The service plan marked Charles H. satisfactory for keeping appointments with CYFS and his caseworker. However, Charles H. was unsatisfactory for failing to fully engage in court-ordered services and in visitation with J.H. J.H. refused to engage in visits with Charles H. Charles H. was also unsatisfactory for failing to engage in parenting classes. Upon CYFS sending new referrals, Charles H. would start parenting classes in July 2021. Charles H. was unsatisfactory for participating in counseling, where he was discharged due to lack of attendance. Charles H. was satisfactory for signing proper consents, and he would start new counseling services in June 2021.

¶ 23    On November 29, 2021, the State filed a three-count motion seeking a finding of unfitness and termination of the parental rights of Charles H. Count I alleged Charles H. unfit within the meaning of section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)), because Charles H. failed to make reasonable efforts to correct the conditions that were the basis

6

for the removal of the child from him during any nine-month period following the adjudication of neglect or abuse, namely February 28, 2021, through November 28, 2021. Count II alleged Charles H. unfit within the meaning of section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)), because Charles H. failed to make reasonable progress toward the return of the minor to him during any nine-month period following the adjudication of neglect or abuse, namely February 28, 2021, through November 28, 2021. Finally, count III alleged that Charles H. was unfit within the meaning of section 1(D)(b) of the Adoption Act (*id.* § 1(D)(b)), because he failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor.

¶ 24   On December 1, 2021, the circuit court entered a permanency order setting a goal of return home within 12 months. The court noted that Charles H. made reasonable efforts toward returning the minor home, but he did not make reasonable and substantial progress toward returning the minor home. The court noted that Charles H. needed to complete his service plan.

¶ 25   On April 4, 2022, the circuit court held a hearing on the State's motion seeking a finding of unfitness and termination of Charles H.'s parental rights. Kyle Dunlap, the CYFS caseworker for this case from January 2021 until April 2021, testified. Dunlap testified that Charles H. did not report employment to CYFS. Dunlap testified that Charles H. did not consistently complete drug screens, which were required once per week. Dunlap testified that Charles H. did not complete counseling services, parenting classes, or domestic violence classes.

¶ 26   Sherri Cummins, the CYFS caseworker in this matter from May 2021 until the time of the hearing, testified. Cummins testified that Charles H. was required to complete individual counseling, domestic violence classes, parenting classes, and drug screenings. Charles H. only recently began engaging in parenting classes in February of 2022. Prior to that, he was discharged for lack of attendance. Similarly, Charles H. was discharged from counseling for lack of

attendance. Cummins testified that Charles H. never started domestic violence classes. Finally, Charles H. did not participate in drug screens as directed during the relevant period. Cummins testified that J.H. was afraid of Charles H. and refused to participate in visits with him. Due to scheduling issues, the court adjourned the hearing and rescheduled for a later date.

¶ 27    On June 29, 2022, the circuit court continued the hearing on the State's motion seeking a finding of unfitness and termination of Charles H.'s parental rights. Cynthia Morgan, a family law attorney in Champaign County, testified.

¶ 28    At the time of the fitness hearing, Cynthia Morgan was a family law attorney in Champaign County. She served as a limited guardian *ad litem* for Champaign County. Morgan was appointed as the limited guardian *ad litem* in the family law case between Charles H. and J.H.'s mother, Laura Young (Goddard). Her appointment was through the family law case, not the juvenile abuse neglect case. Morgan was appointed in the family law case around April of 2019.

¶ 29    The State objected to Morgan's testimony regarding the 2019 investigation, arguing that the juvenile neglect case was not open in 2019. The State argued that the nine-month period alleged in the petition fell within 2021. As such, the State argued that Morgan's testimony about the 2019 investigation was not relevant to the State's motion seeking a finding of unfitness.

¶ 30    Counsel for Charles H. argued that Morgan's testimony was relevant to demonstrate that during the family law case, Morgan recommended no restrictions for parenting time between Charles H. and J.H. Counsel for Charles H. argued that the testimony was relevant to demonstrate whether parental alienation was an issue in this case.

¶ 31    The circuit court asked counsel for Charles H. to clarify whether Morgan would testify to evidence alleged in the State's petition from February 28, 2021, through November 28, 2021. Counsel responded that Morgan would not testify to evidence in that timeframe. As such, the court

8

ruled Morgan's testimony inadmissible, where the testimony was not relevant based upon the timeframe alleged in the petition.

¶ 32    The circuit court asked counsel for Charles H. whether Morgan would testify to any information regarding parental alienation in the time period alleged by the State. Counsel clarified that Morgan could not testify to the specific timeframe, but Morgan's testimony would demonstrate the relationship between J.H. and Charles H. Counsel argued that Morgan would testify to "concerns about any interference by others with Charlie H[.] and his child's relationship."

¶ 33    The circuit court responded:

> "Well, let me just put it this way. If you're asking that Ms. Morgan be allowed to provide her opinion as a family law attorney about these issues, again, based upon hearsay conversations she had with either your client or anyone else from two years ago or three years ago, I mean, I would suggest that it would be difficult for me to see a place where that would be rendered an opinion that I can take much stock in, in a situation where she's not being tendered as some kind of expert witness or anything along those lines.

> So—so, again, [counsel for Charles H.], if there's any other basis for Ms. Morgan to testify, that's fine. But I think that [the State's] argument regarding the time period that Ms. Morgan was involved in a family case from two, three years ago is well taken."

¶ 34    Counsel for Charles H. explained that Morgan would testify that she found that it was in the best interest of the child that Charles H. have parenting time with the child without restriction during the family case. The circuit court responded: "I have no reason to doubt that would have been the case in 2019, but we're talking about at least two years later." Counsel for Charles H. excused the witness.

9

¶ 35    Clarissa Rodabaugh, Charles H.'s partner, testified. Rodabaugh testified that she and Charles H. were together for the last 12 years. From February 2021 through November 2021, Rodabaugh and Charles H. resided together. Rodabaugh testified that Charles H. was employed at K&D property management in Rantoul, Illinois. Rodabaugh testified that Charles H. was unable to complete drug screens and participate in counseling due to his work schedule.

¶ 36    Rodabaugh testified that Charles H. suffered a health issue related to his stomach and diabetes, which interfered with his ability to complete services. Following the loss of multiple family members, Charles H. "hit a downward spiral" where he did not "want to function" or "get out of bed." Rodabaugh testified that Charles H. did not "want to go to work," and he did not "want to do anything."

¶ 37    Rodabaugh testified that Charles H. and J.H. had a "wonderful relationship," and J.H. did not fear his father. Rodabaugh was present for a visit in "August or November" of 2020, where Charles H. and J.H. visited at Brookhill Park. J.H. and Charles H. "communicated wonderfully," and J.H. "ran up, gave him a hug, couldn't wait to talk to him." According to Rodabaugh, J.H. did not appear to be afraid of Charles H. Rodabaugh did not observe anything during in-person visits that made her believe that J.H. was afraid of Charles H.

¶ 38    Charles H. testified that during the time period at dispute, his stepfather, mother, and son passed away.[4] Charles H. testified that this presented a difficult time in his life. Charles H. did not believe that J.H. was afraid of him.

¶ 39    Charles H. testified that he was unable to complete services due to his work schedule. During the relevant timeframe of February 28, 2021, through November 28, 2021, Charles H. was on probation and subject to random drug screenings. Charles H. testified that he completed his

---

[4]Charles H.'s son who passed away during the proceedings is a different child than the 2006 indication for abuse and neglect resulting in the death of a child.

probation screens. Following arguments from the parties, the court took the matter of parental fitness under advisement.

¶ 40    On July 13, 2022, the circuit court announced its ruling on parental fitness. Relevant to the disposition of this appeal, the court stated the following in rendering its decision:

"I do think it's incumbent upon me to explain and remind the parties that this is an objective standard which focuses again on the amount of progress toward return of the child to the parent that is reasonable to expect under the circumstances—and this is important—— without making allowances for handicaps or difficulties peculiar to the parent. All right. I'm going to say that again, without making allowance for handicaps or difficulties peculiar to the parent, so, in other words, if reasonable progress has not been made even if there is some explanation for it that doesn't change the reasonable progress finding. So the fact that [Charles H.] says that, well, I had health problems or I was in grief or all these things were taking place and that's why I couldn't do the services that in some ways may explain why it didn't happen, but it doesn't change the fact that the progress didn't happen."

¶ 41    The circuit court first found that the State failed to meet its burden as to count III, finding that Charles H. remained interested and desired custody of J.H. Turning to count I, reasonable efforts, the court noted that Charles H. did not complete his required services, which included domestic violence services. Charles H. also failed to participate in drug screenings, even though substance abuse was an ongoing issue in the case. The court noted that the evidence demonstrated that Charles H. suffered from health problems, worked long hours that made it difficult to get drug screens, and lost several family members in rapid succession. The court noted that this case presented a close call but found that the State did not meet its burden by clear and convincing

11

evidence that Charles H. failed to make reasonable efforts to correct the conditions or to address deficiencies.

¶ 42     Finally, the circuit court turned its attention to count II, which alleged that Charles H. failed to make reasonable progress toward the return of the minor to him during the relevant nine-month period. The court noted that it considered the evidence of Charles H.'s health and family issues, but "it doesn't change the fact that the progress didn't happen." Charles H. had few opportunities to be with his son. The court noted that it did not find that the evidence established that there was interference by the mother or her family resulting in parental alienation. The court noted that, although visitation is an important piece, Charles H. failed to make progress toward return home by failing to complete services. Therefore, the court determined that the State proved by clear and convincing evidence that Charles H. failed to make reasonable progress during the nine-month period set forth in the State's motion.

¶ 43     The next day, on July 14, 2022, the circuit court entered the order on parental fitness. The court found Charles H. an unfit person and parent where he failed to make reasonable progress toward the return of the minor to him during the nine-month period in the State's motion.

¶ 44     On August 9, 2022, DCFS filed a best interest report. The report noted that J.H. was in care for two years, during which time he lived with his maternal grandmother. J.H. had a strong and loving bond with his grandmother, aunt, and uncle who resided in the home. The caseworker believed J.H. was in a loving, stable, and secure home where he could receive permanency.

¶ 45     On August 15, 2022, the circuit court held a best interest hearing. Charles H. testified at the hearing that he wished to have visitation with J.H. Charles H. testified that he loves J.H. Sherri Cummins, the caseworker for CYFS, testified that J.H.'s anxiety decreased by not attending visitation with Charles H.

12

¶ 46 Following arguments from the parties, the circuit court noted that it considered the testimony at the hearing, the best interests report, and the best interests factors. The court noted that J.H. lived with his maternal grandmother since August 2020, where he was well cared for, and his safety and welfare were prioritized. He had adequate shelter, clothing, emotional and personal needs met. The court noted that J.H. developed into "a fine young eleven-year-old, who is engaging and bright, and enjoys football, enjoys spending time with his family, has great relationships with the folks in that home, and the extended family as well."

¶ 47 The circuit court noted that as to attachments, J.H. was well bonded to his maternal grandmother. J.H. expressed a desire for his grandmother to adopt him. J.H.'s grandmother also wished to adopt him. J.H. noted that he loves his mother but did not wish to live with her.

¶ 48 The circuit court indicated that the best interests report noted that J.H. did not wish to live with his father, and J.H. feared his father. J.H. expressed physical discomfort, including stomach pain, when he must be around his father. The court noted that it considered the arguments related to parental alienation but found that the agencies listened to J.H.'s requests and abided by J.H.'s wishes not to see his father. The court noted that there is "obviously a hugely fractured relationship between [J.H.] and his father."

¶ 49 For these reasons, the court determined that it was in J.H.'s best interests to terminate the parental rights of both mother and Charles H. The circuit court entered a permanency order changing the permanency goal to adoption.

¶ 50 On August 16, 2022, the circuit court entered an order terminating parental rights. After considering the factors, the court found that the State proved, by a preponderance of the evidence and by clear and convincing evidence, that it was in the best interest of J.H. that the parental rights of Charles H. be terminated. Charles H. timely appealed.

¶ 51                                    II. Analysis

¶ 52    On appeal, Charles H. challenges the circuit court's judgment terminating his parental

rights to J.H., arguing the court erred by finding the proffered testimony of Morgan irrelevant.

Charles H. also argues that CYFS failed to provide effective services, impeding Charles H. in his

efforts to make reasonable progress toward reunification. Next, Charles H. argues that the court

misinterpreted the standard by which "reasonable progress" is measured. Finally, Charles H.

argues that the court's best-interests determination was against the manifest weight of the

evidence. For the following reasons, we disagree with Charles H., and we affirm the judgment of

the circuit court.

¶ 53    "[T]ermination of parental rights is an extraordinarily serious matter." *In re M.F.*, 304 Ill.

App. 3d 236, 238 (1999). "The termination of parental rights constitutes a permanent and complete

severance of the parent-child relationship." *In re C.N.*, 196 Ill. 2d 181, 208 (2001). The Juvenile

Court Act establishes a two-step process for the involuntary termination of parental rights. See 705

ILCS 405/2-29(2) (West 2020). First, the State must prove, by clear and convincing evidence, that

the parent is an unfit person as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D)

(West 2020)). *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Section 1(D) sets forth multiple

grounds "under which a parent may be found unfit, any of which standing alone may support" a

finding of unfitness. *Id.* If the circuit court finds the parent unfit under one of the enumerated

grounds, the court must then determine whether it is the child's best interest that parental rights be

terminated. 705 ILCS 405/2-29(2) (West 2020). With this in mind, we consider the specific

arguments made by Charles H. on appeal.

14

¶ 54                          A. Testimony of Ms. Morgan

¶ 55    Charles H. first argues the circuit court erred by finding the proffered testimony of Morgan irrelevant. The State responds that the court did not abuse its discretion when it sustained an objection to irrelevant testimony, thereby excluding the testimony of the witness. We agree with the State.

¶ 56    " 'The admissibility of evidence rests within the discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion.' " *In re L.S.*, 2014 IL App (4th) 131119, ¶ 44 (quoting *People v. Pikes*, 2013 IL 115171, ¶ 12). " 'Under this standard, an abuse occurs when the trial court's ruling is fanciful, unreasonable or when no reasonable person would adopt the trial court's view.' " *Id.* (quoting *People v. Taylor*, 2011 IL 110067, ¶ 27).

¶ 57    The proffered testimony of Morgan indicated that Morgan served as limited guardian *ad litem* to J.H. during an unrelated family law case in 2019. Morgan was not involved with the present juvenile abuse and neglect case. The State's petition alleged a nine-month timeframe from February 28, 2021, through November 28, 2021. However, Morgan was involved with J.H. approximately three years earlier in April 2019. As noted by the circuit court, Morgan's proffered testimony fell widely outside the nine-month period alleged in the State's petition.

¶ 58    Even assuming the circuit court allowed Morgan's testimony, it would not have related to or changed the fact that Charles H. failed to make reasonable progress towards the return of the minor to him, where he failed to complete services. "Evidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). Because Morgan's testimony fell well outside the nine-month period alleged in the petition, and where the testimony did not relate to any fact of consequence, the circuit court did not abuse its discretion in excluding the testimony as irrelevant.

15

¶ 59                                    B. CYFS Services

¶ 60    Charles H. next argues that CYFS failed to provide effective services to Charles H. and J.H., thereby impeding Charles H. in his efforts to make reasonable progress toward reunification. We disagree.

¶ 61    The State first responds that Charles H. forfeited this issue where his brief fails to comply with Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020). Specifically, the State notes that Charles H. failed to state a standard of review and failed to provide analysis of the issue in his argument. In reply, Charles H. concedes that he did not cite a standard of review. Charles H. asks this court to excuse the forfeiture, where this case involves the well-being of a child. Where this case involves the well-being of a child and parental rights, we elect not to apply forfeiture and will consider the case on the merits. See *In re Madison H*., 215 Ill. 2d 364, 371 (2005).

¶ 62    Forfeiture notwithstanding, the State argues that Charles H. failed to make reasonable progress toward the return of the minor to him, where he failed to attend counseling, parenting classes, drug screens, and domestic violence services. We agree.

¶ 63    Charles H. focuses his argument on visitation. Specifically, Charles H. notes that he only visited with J.H. twice during the timeframe at dispute. Visitation ended because J.H. indicated an unwillingness to participate in visitation, where he feared Charles H. Charles H. also argues that he suffered several deaths in the family which impeded his ability to participate in services.

¶ 64    The circuit court considered these exact issues during the unfitness hearing. The court had the opportunity to hear testimony and review reports regarding issues with visitation, along with Charles H.'s struggles with physical and mental health. Nonetheless, the circuit court was tasked with determining whether Charles H. made reasonable progress toward the return of J.H. to him between February 28, 2021, and November 28, 2021.

¶ 65   One ground of unfitness is the failure by a parent "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act." 750 ILCS 50/1(D)(m)(ii) (West 2020). "Reasonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances." (Emphasis omitted.) *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). Reasonable progress requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006).

¶ 66   Although DCFS service plans are an integral part of the statutory scheme, our supreme court has rejected the view that the sole measurement of parental progress is the parent's compliance with service plans. *In re C.N.*, 196 Ill. 2d at 214-15. Instead, the supreme court ruled that

> "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id*. at 216-17.

Moreover, the Fourth District has repeatedly stated that "a court is duty bound to ensure that serious parental deficiencies of whatever nature have been corrected before the court permits one of its wards to be returned to that parent's custody." *In re L.L.S.*, 218 Ill. App. 3d 444, 464 (1991); *In re C.M.*, 305 Ill. App. 3d at 164; *In re C.S.*, 294 Ill. App. 3d 780, 790 (1998).

¶ 67 Here, the service plan required Charles H. to complete drug screens, attend counseling services, attend parenting classes, and attend domestic violence classes. The evidence showed that, during the relevant time period, Charles H. failed to complete, and oftentimes even begin, the services outlined in his service plan. Thus, the evidence supported the circuit court's finding that Charles H. failed to make reasonable progress toward the return home goal. Although Charles H. argues that visitation was arguably impeded, this does not change the fact that the evidence supported a finding that he failed to make progress towards the other services outlined in his service plan. The services were available to him, yet Charles H. did not complete, and in many cases even begin, services. Accordingly, we cannot say that the court's finding that Charles H. was unfit, as defined in section 1(D)(m)(ii) of the Adoption Act, was against the manifest weight of the evidence.

¶ 68                                    C. Reasonable Progress

¶ 69 Charles H. next argues that the circuit court misinterpreted the standard by which "reasonable progress" is measured. We disagree.

¶ 70 First, the State argues that Charles H.'s brief fails to comply with Rule 341, where Charles H. fails to set forth a standard of review and fails to provide analysis of the issue raised in his argument. In reply, Charles H. concedes that he did not cite a standard of review. Charles H. asks this court to excuse the forfeiture.

¶ 71 The State additionally responds that Charles H. forfeited this issue where he failed to raise it before the circuit court. "Generally, an issue that was not objected to during trial and raised in a posttrial motion is forfeited on appeal." *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41. Here, however, where this case involves the well-being of a child and parental rights, we elect not to apply forfeiture and will consider the case on the merits. See *In re Madison H.*, 215 Ill. 2d at 371. This

18

court has reviewed the record and the judgment of the circuit court, and we find no error in the court's judgment. See *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 30 ("[F]orfeiture is a limitation on the parties, not the reviewing court, and we will relax the forfeiture rule to address a plain error affecting the fundamental fairness of a proceeding, maintain a uniform body of precedent, and reach a just result.").

¶ 72 Turning to the merits, Charles H. seemingly argues that the circuit court erred in its application of the reasonable progress standard. Specifically, Charles H. takes issue with the following statement of the court:

> "I do think it's incumbent upon me to explain and remind the parties that this is an objective standard which focuses again on the amount of progress toward return of the child to the parent that is reasonable to expect under the circumstances—and this is important— without making allowances for handicaps or difficulties peculiar to the parent. All right. I'm going to say that again, without making allowance for handicaps or difficulties peculiar to the parent, so, in other words, if reasonable progress has not been made even if there is some explanation for it that doesn't change the reasonable progress finding. So the fact that [Charles H.] says that, well, I had health problems or I was in grief or all these things were taking place and that's why I couldn't do the services that in some ways may explain why it didn't happen, but it doesn't change the fact that the progress didn't happen."

The State responds that the trial court used the proper standard for determining if Charles H. failed to make reasonable progress of the minor to him. We agree with the State.

¶ 73 Our colleagues in the Fourth District held that reasonable progress is an " 'objective standard' and that a parent has made reasonable progress when 'the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and

19

of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody.' " (Emphasis in original.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88 (citing *In re L.L.S.*, 218 Ill. App. 3d at 461). "If all a parent had to do was make 'a minimum measurable or demonstrable movement toward reunification,' it could be years before the parent was prepared for reunification." *Id.*

¶ 74    Further, reasonable progress is an objective standard that is not concerned with a parent's individual efforts and abilities. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). We review reasonable progress using an objective standard relating to making progress toward the goal of returning the child home. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). Reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress can be found if the trial court can conclude that it can return the child to the parent in the near future. *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22.

¶ 75    As noted above, the evidence demonstrated that Charles H. failed to complete, and often even begin, services. As such, it is unclear whether J.H. could have returned to Charles H.'s care "in the near future" when he still had significant work ahead of him to complete his service plan. Therefore, based on the law before us, the circuit court correctly characterized the "reasonable progress" standard. We find no error in the circuit court's rulings.

¶ 76                                D. Best Interest Determination

¶ 77    Charles H. next argues that the circuit court's determination that it was in the best interest of J.H. to terminate his parental rights was against the manifest weight of the evidence. The State responds that the court's determination that it was in the best interest of the minor to terminate Charles H.'s parental rights was not against the manifest weight of the evidence. We agree with the State.

20

¶ 78    As noted, if the circuit court finds the parent unfit, the matter proceeds to a second hearing, where the State must prove, by a preponderance of the evidence, that it is in the child's "best interests" that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). During the second step of the process, the focus of the court's scrutiny shifts from the rights of the parents to the best interests of the child. *In re D.T.*, 212 Ill. 2d at 365. Section 1-3 of the Juvenile Court Act lists the "best interests" factors that should be considered by the trial court when making a "best interests" determination. 705 ILCS 405/1-3(4.05) (West 2020). Specifically, the circuit court must consider the following factors in the context of the child's age and developmental needs: (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the persons available to care for the child. *Id.* The court's best interest determination will be reversed only if it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 79    Here, the circuit court considered the best interest factors and found it in J.H.'s best interest that Charles H.'s parental rights be terminated. The evidence showed that J.H. lived with his maternal grandmother since August 2020, where he was well cared for, and his safety and welfare were prioritized. He had adequate shelter, clothing, emotional and personal needs met. The court noted that J.H. developed into "a fine young eleven-year-old, who is engaging and bright, and enjoys football, enjoys spending time with his family, has great relationships with the folks in that home, and the extended family as well." The evidence demonstrated that J.H. was well bonded to his maternal grandmother. J.H. expressed a desire for his grandmother to adopt him. J.H.'s

21

grandmother also wished to adopt him. J.H. noted that he loves his mother but did not wish to live with her.

¶ 80    Based on the evidence presented, we conclude that the circuit court's determination that it was in J.H.'s best interest to terminate Charles H.'s parental rights was not against the manifest weight of the evidence.

¶ 81                                    III. Conclusion

¶ 82    For the reasons stated, we affirm the circuit court's judgment terminating the parental rights of Charles H.


¶ 83    Affirmed.