2025 IL App (1st) 241635

FIRST DISTRICT
SECOND DIVISION
April 22, 2025

Nos. 1-24-1635 and 1-24-1641 (Consolidated)

| | | |
|---|---|---|
| *In re* D.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 22JA928 |
| v. | ) | |
| | ) | |
| Imelda G. and Angel S., | ) | |
| | ) | Honorable |
| Respondents-Appellants). | ) | Shannon P. O'Malley, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment and opinion.

## OPINION

¶ 1     Respondent Imelda G. is the natural mother and respondent Angel S. is the natural father

of the minor D.S., a boy born June 4, 2020. The trial court adjudicated D.S. to be neglected

based on an injurious environment and a lack of care. Following a disposition hearing, the trial

court adjudged D.S. a ward of the court. Specifically, the trial court found Imelda G. was fit,

able, and willing to care for D.S. and returned custody of the minor to Imelda G. with an order of

protective supervision entered. Angel S. was found unable to care for D.S.

¶ 2     In this consolidated appeal, Imelda G. argues that the trial court's findings of neglect

were against the manifest weight of the evidence. Angel S. contends that (1) the neglect findings

were against the manifest weight of the evidence, (2) multiple errors occurred during the

adjudication hearing, and (3) the trial court's finding that it was in the best interest of D.S. to be adjudged a ward of the court was against the manifest weight of the evidence.

¶ 3    On December 20, 2022, the State filed a petition for adjudication of wardship and alleged the following supporting facts:

> "On December 15, 2022, the police responded to a well being check request and found this minor's home to be uninhabitable. This minor's cousin who resided in the same home reported that this minor's mother and putative father use illegal substances, including in the presence of this minor. This minor's cousin took photos of the illegal substances in mother and putative father's bedroom. This minor's cousin and family members report that there are multiple weapons in the home, including a gun, tazers [*sic*], knives, and a bow and arrows. The police removed this minor from the home on December 15, 2022. On or about December 9, 2022, this minor was observed to be altered after being alone with mother and putative father in their bedroom. When this minor's cousin asked mother regarding minor's presentation, mother stated that this minor must have taken a THC gummy. Mother refused to take minor to the emergency room. On December 16, 2022, this minor tested positive for marijuana. Family members state that when putative father is under the influence of illegal substances, he is violent. Putative father threatened to put a gun to this minor's head and has bit, punched, pushed down the stairs, and attempted to gauge [*sic*] out a family member's eyes. Mother and putative father have been uncooperative with DCFS during this investigation. Mother and putative father reside together."

¶ 4 An adjudication hearing was conducted over multiple dates with testimony from several witnesses. Dil. S. testified that respondents are her parents, and she is the older sister of D.S. She was 19 years old when D.S. was born and was living with her parents and teenage brother Di. S. at that time.

¶ 5 She moved out of the home in October 2020 because her parents were consuming drugs and had "an addiction problem." Her parents' behavior made her suspect that they were consuming drugs. Respondents "would become very paranoid, looking out all the windows," their speech was "very impaired," such that Dil. S. could not understand them, and they were aggressive. Imelda G.'s eyes "would be open wide without her blinking." Angel S. "would walk on his tiptoes" and he had a "loose jaw." This behavior was different from what Dil. S. considered their normal behavior. She witnessed her parents consume marijuana edibles and Angel S. roll "blunts" with marijuana in the presence of D.S. The drug use occurred in the basement of the house, and Dil. S. described the space as "very smoky," and smelling "very dingy, like the drug substance smells."

¶ 6 In October 2022, Imelda G. told Dil. S. that a cousin, Taylor T., would be moving into the home because Taylor T.'s living situation "wasn't appropriate for her at the time." Taylor T.'s mother and Imelda G. are sisters. Taylor T. was 17 years old when she moved in with her aunt and uncle . Dil. S. talked and texted with Taylor T. regularly. In November 2022, Taylor T. contacted Dil. S. about her concerns that respondents were using drugs with D.S. in the room. Dil. S. went to respondents' home that day with her fiancé, her aunt, and her uncle. Dil. S. observed respondents in an upstairs bedroom with D.S. present on the bed. When Dil. S. entered the kitchen, it was "covered in dishes, roaches."

¶ 7    At Thanksgiving, Angel S. admitted his drug use to family members, including Dil. S. He told them that he knew the drugs they were using were bad, "but it's gotten a lot worse" and they had been "experimenting with a lot more things now." In response, Imelda G. told Angel S. "not to be putting their business out for everybody to hear, that nobody wants to know everything that's going on in the home." Following Thanksgiving, D.S., Di. S., and Taylor T. stayed with their grandparents for two weeks and returned home on December 3, 2022.

¶ 8    Later on December 3, 2022, Taylor T. called Dil. S. through Facebook Messenger and told Dil. S. that Angel S. and Di. S. had been in a physical altercation. Taylor T. described the physical altercation between Angel S. and Di. S. during which Angel S. tried to "gouge out" Di. S.'s eyes. Taylor T. further detailed that Di. S. had called the police, but before the police arrived Angel S. told Di. S. that if Di. S. spoke to the police about what happened, then Angel S. would go outside with a gun to D.S.'s head to "make the officers go away." Angel S. also stated that he "was not going to get sent to prison again." When the officers arrived, only Angel S. spoke to them.

¶ 9    On December 9, 2022, Taylor T. called Dil. S. to tell her that D.S. had ingested one of respondents' tetrahydrocannabinol (THC) gummies and appeared high. Taylor T. told her that D.S.'s head was rolling back, he had tears "streaming down his face," and he "was just out of it." Taylor T. stated that both respondents knew "what state" D.S. was in, but did not want to take him to the hospital. They gave him milk and had him take a bath or shower. Dil. S. did not go to respondents' home that day.

¶ 10    On December 14, 2022, Taylor T. contacted Dil. S. and said that she had "obtained some evidence," to which Dil. S. responded that Taylor T. should not be "putting herself at risk." Taylor T. also told Dil. S. that she was sending photos of respondents' nightstand via text

4

message. Dil. S. received photographs of a "burnt dresser along with the contents within the dresser, which [was] a baggie that had a white substance in it." She recognized the nightstand from respondents' bedroom, which she had observed during her November 2022 visit to the home. Dil. S. also recognized the photographs of the contents to be the same dresser. Taylor T. also sent a third photograph the next day, December 15, 2022, showing what Dil. S. believed to be a gun in a lower drawer of a wardrobe. Dil. S. recognized the wardrobe from when she lived with respondents. It was located in the dining room, and she observed it during her November visit.

¶ 11    Later that day, Dil. S. went over to respondents' home after work because Taylor T. and Di. S. called her that evening and were concerned. They became concerned about what respondents were doing after hearing a lighter clicking and seeing cloudy smoke in the house. Dil. S. and her fiancé went to respondents' home. They then called the police because Dil. S. was scared that Taylor T. and D.S. were in the home, and she did not want there to be another physical altercation. Dil. S. did not go into the home and instead she parked at the end of the block. Taylor T. and Di. S. were inside the home while Dil. S. and her fiancé waited in the car for the police to arrive.

¶ 12    After the police arrived, Dil. S. spoke to them outside of respondents' home and remained there while the police entered the house. Shortly thereafter, she saw Taylor T., Di. S., and D.S. speak to the police on the front steps of the home. Then, she watched them all get into a police car. Dil. S. did not see either of the respondents speak to the police outside of the home that night. Dil. S. was allowed to take Taylor T. and D.S. to her home that evening. At around 2 a.m. on December 16, 2022, Imelda G. tried to call Dil. S. and later sent her a text message indicating that Imelda G. "wanted her baby back."

¶ 13    Later on December 16, 2022, Dil. S. contacted the Department of Children and Family Services (DCFS) through their hotline. She, Taylor T., and D.S. met with a DCFS worker in Dil. S.'s home. Dil. S. signed a safety plan and agreed to keep D.S. and Taylor T. in her home and in her care. Respondents did not come to Dil. S.'s home to visit with D.S. while he was in her care.

¶ 14    Marissa Panzarella testified that she was employed as a child protection investigator with DCFS. She was assigned to D.S.'s case on or about December 16, 2022. She assessed both D.S. and Taylor T. at Dil. S.'s home. She examined D.S. and did not see any visible marks or bruises. Panzarella spoke with Taylor T. about living with Imelda G. and Angel S. Taylor T. told her that she and D.S. were not safe with Imelda G. and Angel S. because there were concerns about drug use in the home. According to Taylor T., respondents would "barricade" themselves in a bedroom and use drugs with D.S. present. Panzarella described a video shown to her by Taylor T. The recording was made by Taylor T. while she lived at respondents' home when Taylor T. noticed D.S. appeared "off." In the video, Taylor T. approached respondents about D.S., and Imelda G. said that D.S. "must have taken a gummy." Taylor T. responded that D.S. needed to go to the hospital but was told by Imelda G. that they did not "want to go to jail."

¶ 15    Also on December 16, 2022, Panzarella administered an oral toxicology swab on D.S. She explained that the test is given any time there is a concern of substance use. She had administered the test in prior investigations involving substance abuse and had been specifically trained how to properly administer the test. A new, fresh kit was used to acquire a saliva sample from D.S. via a cotton swab. Panzarella took a photograph of the results of the test administered to D.S. The photograph of the result was presented during the hearing and indicated a presumptive positive result for marijuana/THC. Panzarella testified that the drug test loses

6

effectiveness if the test gets too hot or too cold. She carried the test outside on December 16, 2022, when she traveled from her office to Dil. S.'s home. Based on the positive result, Panzarella implemented a safety plan with her supervisor for D.S. and Taylor T. to stay with Dil. S. Panzarella called and texted respondents multiple times but was unable to contact them.

¶ 16    Panzarella sent a text message to each of the respondents on December 19, 2022, requesting that they complete a toxicology screen, which they subsequently completed. The substance screens indicated one respondent tested positive for cocaine and the other respondent tested positive for THC and cocaine. Panzarella was never able to interview either parent nor did she ever enter respondents' home. The allegations for the investigation included concerns of possible substance use by both respondents.[1]

¶ 17    Evidence presented at the hearing disclosed that a hair follicle toxicology test was administered to D.S. on January 19, 2023. Hair from D.S.'s head was collected in person at the Fastest Labs of Northwest Chicago in Elk Grove Village, Illinois. The specimen was received at the United States Drug Testing Laboratories in Des Plaines, Illinois, on January 21, 2023. The January 26, 2023, report indicated a positive result from D.S.'s hair follicle sample for cocaine and cannabinoids, including THC.

¶ 18    A forensic victim sensitive interview was conducted with Taylor T. on December 23, 2022. Panzarella was present as a witness. A recording of the interview was introduced at the hearing in which Taylor T. detailed the following. She lived with respondents, who are her aunt and uncle, and cousin D.S. from early or mid-October 2022 until December 2022 when she was "taken from them" because "of the things they do, like drugs." She described incidents where respondents would take D.S. into the room with them when they were getting high, and she

---

[1]Although Panzarella did not identify which respondent tested positive for only cocaine or cocaine and THC, neither has contested the positive test results for his or her drug use.

"hate[d] that" and tried to "get D.S. out" when that happened. Taylor T. also detailed an incident while living with respondents when D.S. "took edibles" that respondents "had laying around" and respondents refused to take D.S. to the hospital because Angel S. did not want to go to jail. Angel S. then turned off the Wi-Fi in the home so Taylor T. could not call or text anyone for help. Taylor T. described Angel S. as "difficult to get along with." She stated that she got in trouble one time living with respondents because she told her family that respondents were doing drugs and Angel S. told Taylor T. that if she did that again then she would get kicked out of the house. The State rested its case following the admission of this evidence.

¶ 19    Imelda G. called Dr. David Gummin to testify as a toxicology expert. He reviewed discovery documents related to both the saliva and hair follicle drug testing performed on D.S., as well as documents related to the investigation of the household. A Premier Biotech oral toxicology saliva test was administered on D.S. on December 16, 2022. This test is performed by "having an individual essentially place a cotton pledget into his or her mouth and to suck on that pledget until sufficient saliva has come from the mouth" and has been observed on the "pledget." The "pledget" is then placed into an analyzer to perform an amino acid test on the saliva for specific drugs or "toxicants." Dr. Gummin did not identify any problems with the reliability of this "at home" saliva test. The test result indicated positive for marijuana, but Dr. Gummin had an issue "with the ability to adequately interpret" the result. He noted that the result was reported as a "presumptive positive," which would need to be confirmed by a testing laboratory to give a true positive result.

¶ 20    Dr. Gummin testified that temperature could affect the reliability of the test. The court took judicial notice that the temperature indicated by the National Weather Service on December 16, 2022, was between 26 and 31 degrees Fahrenheit. When asked if it was fair to say that the

8

temperature that day was not "optimal temperature" for this test, the doctor responded, "Not if it were at that temperature at the time." Dr. Gummin noted that there was "not adequate documentation" indicating the environment in which this test was administered to D.S., nor did he know the temperature at which the specimen and analyzer were held at the time of analysis. He observed that these tests are "ideally created to work at room temperature." The "presumptive positive" result would need to be confirmed at a laboratory.

¶ 21 Dr. Gummin also reviewed the lab results from the hair follicle test collected from D.S. on January 19, 2023. He noted that "there was some confusion on the chain of custody form" he was provided as far as getting the specimen to the United States Drug Testing Laboratories. He testified that it was not obvious from the form who had collected the specimen and where it was collected. He also observed that it was not clear how much time elapsed between the collection from D.S. and when it was received by the laboratory. Dr. Gummin did not suspect that the test was conducted on the wrong specimen. The laboratory test results showed that the specimen was positive for both marijuana derivatives/cannabis and cocaine. He conceded that he did not find any problems with the methodology used to test D.S.'s hair specimen.

¶ 22 According to Dr. Gummin, the two most likely ways to receive a positive test would either be from someone ingesting the substance or contamination from the environment, such as aerosol contamination from smoke or drugs in the air or a caregiver stroking the hair of a child and conveying the substances from their sweat into the hair. He testified that it could not be determined if the source of D.S.'s exposure was ingestion or external contamination. After reviewing D.S.'s test result levels, Dr. Gummin believed that it was more likely that D.S. was externally exposed to cocaine and cannabinoids.

¶ 23    Given the fact that D.S.'s hair sample was 1.5 inches long and hair grows approximately half-an-inch per month, Dr. Gummin found the likely time frame for D.S.'s exposure to these substances was a maximum of three months before the sample was taken. This time frame for D.S.'s exposure was likely between late October or November 2022 and January 2023. The hair follicle testing does not provide the ability to determine the exact date or dates D.S. was exposed to each substance. Dr. Gummin admitted that the hair follicle test provided a confirmatory test to the initial presumptive positive from the saliva test.

¶ 24    Angel S. called two witnesses on his behalf. Yolanda Melendez testified that she was D.S.'s grandmother and had spent two weeks at respondents' home in July 2022. During her stay, Melendez did not have any concerns over the state of the family's home or respondents' interactions with D.S. She did not see any signs of drug use or drug paraphernalia. She saw a collection of knives but stated that they were stored in a cabinet out of reach for D.S. Anthony T. testified that he was Taylor T.'s older brother and Imelda G. and Angel S. were his aunt and uncle. He was frequently in respondents' home growing up and considered them to be his second parents. He never saw any drug use in the house. He last saw D.S. in April 2022 and found D.S. to be healthy, fed, and well taken care of. Nothing he saw made him think respondents' home was unsafe. He further testified that Taylor T. had a reputation for dishonesty, and he was told that she called DCFS because she was not getting her way.

¶ 25    Following arguments, the trial court found by a preponderance of evidence that D.S. had been neglected due to an injurious environment and due to a lack of appropriate care as defined in the Juvenile Court Act of 1987 (Juvenile Court Act). See 705 ILCS 405/2-3(1)(a), (b) (West 2022). First, the trial court discussed that D.S. tested positive for drugs in two different tests, including a hair follicle test with corroborating information from Taylor T.'s forensic interview.

Next, regarding respondents' respective arguments, the court noted that Dr. Gummin did not "have a problem" with the way the test was done. Testimony showed respondents in a room with an odor and D.S. "ingesting something, not acting right." The court further pointed to the cocaine test results, the presence of weapons in the home, and entered the above findings of neglect. However, the court declined to find D.S. abused due to substantial risk of injury.

¶ 26    At the disposition hearing on July 30, 2024, Kimberly Graham testified that she was employed as a child welfare specialist with Lutheran Child and Family Services. She was assigned to D.S.'s case in July 2023. At the time of the hearing, D.S. was four years old and placed in a licensed foster home. Following an integrated assessment, both respondents were recommended to participate in multiple services.

¶ 27    Imelda G. was recommended for individual therapy, a substance abuse evaluation, parenting education and coaching, domestic violence assistance, and housing assistance. Graham testified that Imelda G. had completed these services. Imelda G. was on the waiting list for housing assistance and was to start a nurturing parent program in August 2024. Imelda G. had also been subject to random toxicology screenings and all tests were negative. Imelda G. had been granted overnight unsupervised visitation with D.S. for the previous three months. She initially had two-night visitation and later increased to three nights, but Graham's supervisor reduced it to one night because Angel S. was present in the home and had not completed his services. Graham was informed later that Angel S. was no longer residing in the home. The visits were going well for Imelda G. and D.S.

¶ 28    Angel S. was recommended to participate in individual therapy, parenting classes, substance abuse assessment, domestic violence assistance, a sexual abuse assessment, and random toxicology tests. Angel S. had started therapy and completed the parenting education

service, the substance abuse assessment, and domestic violence assessment. Graham indicated that Angel S. would be recommended for parenting coaching soon. Angel S. declined to participate in the sexual abuse assessment. Angel S. had tested negative for all random toxicology tests. He was having weekly supervised visitation with D.S. The visits have gone well, and there is a bond between D.S. and his father. Angel S. had at least one, but possibly up to three, criminal cases pending. Graham testified that one of the cases was for sexual assault involving a minor.

¶ 29    Graham recommended that D.S. be adjudged a ward of the Court with a permanency goal of returning home within five months. At the conclusion of the hearing, the trial court found it was in the best interest of D.S. to be made a ward of court. Regarding Imelda G., the court found her to be fit, willing, and able, and returned D.S. to her custody under an order of protection. The order of protection provided that the Angel S. could not be present at any time in the home. The court further found that family reunification with Angel S. had been unsuccessful and Angel S. was unable to care for, protect, train, or discipline D.S. The court noted that Angel S. had not completed the offered services, had not yet been recommended for parenting coaching, and was refusing to participate in the sexual abuse assessment. Finally, the court further ordered that Angel S. was not to visit the home with Imelda G. and D.S., but he could continue to have supervised visitation.

¶ 30    This appeal followed.

¶ 31    Respondents first argue that the findings of neglect at the adjudication hearing were against the manifest weight of the evidence. Specifically, Imelda G. contends that the neglect findings were not supported by sufficient evidence and were not proven by a preponderance of

the evidence. Similarly, Angel S. asserts that the State failed to provide credible and admissible evidence of neglect.

¶ 32    The Juvenile Court Act provides a two-step process the trial court must utilize to decide whether a minor child should become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing, at which the court considers only whether the minor child is abused, neglected, or dependent. *Id.* ¶ 19; see 705 ILCS 405/2-18(1) (West 2022). If the circuit court determines the minor child is abused, neglected, or dependent at that hearing, then the court holds a dispositional hearing, in which the court determines whether it is consistent with the health, safety, and best interests of the minor child and the public for the minor child to be made a ward of the court. *A.P.*, 2012 IL 113875, ¶ 21; see 705 ILCS 405/2-22 (West 2022). In any proceeding brought under the Juvenile Court Act, including an adjudication of wardship, the paramount consideration is the best interest of the child. *A.P.*, 2012 IL 113875, ¶ 18.

¶ 33    Section 2-3(1) of the Juvenile Court Act defines the circumstances under which a minor can be found "neglected." See 705 ILCS 405/2-3 (West 2022). Here, the trial court found the minor to be neglected under two grounds of the Juvenile Court Act: section 2-3(1)(b) ("environment is injurious to his or her welfare") (*id.* § 2-3(1)(b)) and section 2-3(1)(a) (minor is not receiving the necessary care for his well-being) (*id.* § 2-3(1)(a)). Cases involving allegations of neglect are fact specific and must be decided based on the unique circumstances of the individual case. *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). It is the State's burden to prove allegations of neglect by a preponderance of the evidence, *i.e.*, that the allegations of neglect are more probably true than not. *Id.* at 463-64. We will not reverse a trial court's finding of neglect unless it is against the manifest weight of the evidence. *Id.* at 464. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.* In general,

the trial court is vested with this wide discretion because it has the best opportunity to observe the witnesses' testimony, assess credibility, and weigh the evidence. *In re M.D.*, 2021 IL App (1st) 210595, ¶ 25. Since the grounds for unfitness are independent, evidence supporting any one of the alleged statutory grounds is sufficient to affirm a finding of unfitness. *In re M.W.*, 2019 IL App (1st) 191002, ¶ 56.

¶ 34    We first consider whether the evidence supported the trial court's finding that D.S. was neglected due to an injurious environment. "Neglect" has generally been defined as the failure of a responsible adult to exercise the care that circumstances justly demand. *M.D.*, 2021 IL App (1st) 210595, ¶ 24. Neglect is not limited to a narrow definition and encompasses both the willful and the unintentional disregard of duty. *A.P.*, 2012 IL 113875, ¶ 22. Neglect does not have a fixed and measured meaning, but rather, "[i]t takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Internal quotation marks omitted.) *Id.* The term "injurious environment" is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe nurturing shelter for his or her children. *M.D.*, 2021 IL App (1st) 210595, ¶ 24.

¶ 35    The evidence presented at the adjudication hearing firmly established that D.S. had been neglected due to an injurious environment. Significantly, D.S. tested positive for exposure to both cocaine and THC. Panzarella administered an oral toxicology test that had a presumptive positive for THC result. Dr. Gummin attempted to diminish this result by noting that the air temperature on December 16, 2022, was approximately 26 to 31 degrees Fahrenheit. However, Panzarella rebutted any suggestion that the test was improperly administered. She testified that test was outside when she traveled from her office to Dil. S.'s home. There is no suggestion from

her testimony that it was administered outside in the cold temperature or kept in the cold for an extended period of time. Moreover, the extensive hair follicle test administered on D.S.'s hair showed positive test results for THC and cocaine. Additionally, the results indicated that D.S.'s exposure occurred at any time between late October 2022 and January 2023. Respondents both contend that D.S. could have been exposed to drugs after he was placed in foster care since that time frame fell within the exposure window. However, respondents both ignore their own positive drug tests. As Panzarella testified, one parent tested positive for cocaine and the other tested positive for cocaine and THC. Further, Angel S. admitted to their drug use to other family members at a Thanksgiving gathering and Imelda G. attributed the THC to D.S.'s ingestion of a marijuana gummy.

¶ 36    We flatly reject respondents' claim that D.S. was exposed to drugs after he was removed from their care. Neither respondent offers any support for this contention, and there was overwhelming witness testimony that corroborated respondents' use of drugs at the time of exposure. Dil. S. moved out of her parents' home in October 2020 due to their drug use. She observed her parents consume marijuana edibles and Angel S. roll marijuana "blunts" with D.S. present. She stated that the drug use occurred in the basement of the house, and she described the space as "very smoky" and smelling "very dingy, like the drug substance smells." Dil. S. also recounted Angel S.'s admission of drug use to family members, including Dil. S., at Thanksgiving. According to Dil. S., Angel S. told family members he knew the drugs they were doing were bad, "but it's gotten a lot worse" and they had been "experimenting with a lot more things now." Imelda G. responded for Angel S. "not to be putting their business out for everybody to hear, that nobody wants to know everything that's going on in the home."

¶ 37    Later, Dil. S. spoke with her cousin Taylor T., who was living in respondents' home.

Taylor T. recounted her concerns about respondents' drug use. On December 9, 2022, Taylor T. told Dil. S. that D.S. had ingested one of respondents' THC gummies and appeared high. Taylor T. described that D.S.'s head was rolling back, tears were "streaming down his face," and he "was just out of it." According to Taylor T., both respondents knew "what state" D.S. was in but did not want to take him to the hospital. Taylor T. also told Panzarella about this incident with the marijuana gummy. Panzarella viewed a video recording made by Taylor T. while she lived at respondents' home and Taylor T. noticed D.S. appeared "off." In the video, Taylor T. approached respondents about D.S. and Imelda G. said that D.S. "must have taken a gummy." Taylor T. responded that D.S. needed to go to the hospital but was told by Imelda G. that they did not "want to go to jail."

¶ 38    Section 2-18(2)(g) of the Juvenile Court Act provides that, in any hearing, "proof that a parent, custodian, or guardian of a minor repeatedly used a controlled substance, in the presence of the minor or a sibling of the minor is prima facie evidence of neglect." 705 ILCS 405/2-18(2)(g) (West 2022); see 720 ILCS 570/102(f) (West 2022) (defining a "Controlled Substance" as "a drug, substance, immediate precursor, or synthetic drug in the Schedules of Article II" of the Illinois Controlled Substances Act (720 ILCS 570/100 et seq. (West 2022))); 720 ILCS 570/206(b)(4) (West 2022) (identifying cocaine as a schedule II controlled substance). Thus, the State presented *prima facie* evidence of D.S.'s neglect due to an injurious environment based on the positive result for cocaine for D.S., and both respondents, as well as the testimony regarding drug use from Dil. S. and Panzarella, including Angel S.'s own admissions.

¶ 39    Imelda G. asserts that D.S.'s ingestion of a marijuana edible was at most an isolated incident. We disagree with her characterization of the evidence as an isolated incident and find the cases she relies upon to be irrelevant to the facts of this case. See *In re N.B.*, 191 Ill. 2d 338,

353 (2000) (finding that isolated instances of the mother's anger directed at others did not demonstrate "anger of a frequency, duration or quality that would indicate that the children lived in an environment that exposed them to, or threatened them with, emotional or physical injury"); *Slater v. Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶¶ 37-39 (finding that a minor's injury with a colored pencil was an isolated incident that did not establish neglect). In contrast, there was significant evidence of an ongoing issue with drug use by both Imelda G. and Angel S. in which D.S. was exposed to marijuana and cocaine. While Imelda G. objects to the weight the trial court gave to pieces of evidence, the trial court acted well within its authority to make such determinations. See *M.D.*, 2021 IL App (1st) 210595, ¶ 25 (trial court has been vested with wide discretion because it has the best opportunity to observe the witnesses' testimony, assess credibility, and weigh the evidence). Further, while marijuana use is legal in Illinois, the Cannabis Regulation and Tax Act provides that a person is not permitted "to engage in, and does not prevent the imposition of any civil, criminal, or other penalties for engaging in," knowingly using cannabis "in close physical proximity to anyone under 21 years of age who is not a registered medical cannabis patient." 410 ILCS 705/10-35(a)(3)(G) (West 2022).

¶ 40    As detailed above, the evidence established that both respondents used drugs in the home with D.S. A hair follicle test of D.S. showed his exposure to both marijuana and cocaine. This test was further supported by Dil. S.'s testimony about her observations and the admission by Angel S., as well as testimony from Panzarella and Taylor T.'s forensic interview. Accordingly, we conclude that the trial court's finding that D.S. was neglected based on an injurious environment was not against the manifest weight of the evidence.

¶ 41    Since we have found that the finding of neglect was supported under one basis, an injurious environment, we need not consider whether D.S. was neglected due to a lack of care.

See *M.W.*, 2019 IL App (1st) 191002, ¶ 56 (evidence supporting any one of the alleged statutory grounds is sufficient to affirm a finding of unfitness).

¶ 42    Next, we consider additional arguments raised solely by Angel S. He contends that multiple errors occurred at the adjudication hearing that culminated in cumulative error. Specifically, he argues that the trial court erred by (1) admitting Taylor T.'s statements into evidence, (2) prohibiting him from impeaching Taylor T.'s credibility during his cross-examination of Panzarella, (3) preventing him from introducing specific acts of dishonesty by Taylor T., (4) admitting photographs of his home taken by Taylor T. where the judge erroneously indicated that respondent had made no objection, (5) admitting the photographs without proper foundation, and (6) admitting the results of both the oral toxicology and hair follicle test administered to D.S.

¶ 43    Regarding his claims related to Taylor T., Angel S. asserts that the case rested "almost exclusively" on Taylor T.'s hearsay statements. He points to Dil. S.'s testimony recounting what Taylor T. told her was occurring in Angel S.'s home, including photographs taken by Taylor T. He argues that the court erred when it overruled his objections during Dil. S.'s testimony and allowed Taylor T.'s statements into evidence. According to Angel S., the statements were inadmissible hearsay because at the time of the adjudication hearing, Taylor T. was 18 years old and only lived in his home temporarily. The court admitted the statements, noting that she was 17 when the statements were made and residing in the home.

¶ 44    The trial court did not err in admitting these statements by Taylor T. Section 2-18(4)(c) of the Juvenile Court Act provides: "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a

finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 2022). Contrary to Angel S.'s arguments, the allegations of D.S.'s neglect did not rest "almost exclusively" on Taylor T.'s statements. Testimony from both Dil. S. and Panzarella corroborated Taylor T.'s statements, as well as the positive drug tests that showed D.S.'s exposure to marijuana and cocaine.

¶ 45    Further, the Fourth Division of this court has already rejected a similar argument. In that case, the minors' older half-sister, K.S., made an outcry that the respondent had sexually abused her multiple times over several years. The respondent confessed to sexually abusing K.S. to the police in a video recorded statement. *In re D.M.*, 2016 IL App (1st) 152608, ¶ 1. K.S. was the respondent's stepdaughter and was not a party to the petition to adjudicate wardship. *Id.* ¶ 2. At the adjudication hearing, a recording of K.S.'s victim sensitive interview was introduced through the testimony of a police detective who had observed the interview. *Id.* ¶ 6. The trial court admitted the recording of the interview over the respondent's objection based on the lack of a proper foundation. *Id.* ¶ 8. The trial court subsequently found the minors were abused and dependent by a preponderance of the evidence. *Id.* ¶ 11.

¶ 46    On appeal, the respondent argued that the trial court erred in admitting the recording of K.S.'s statement because her statements were not admissible under section 2-18(4)(c) since she was not "the minor" named in the petition for adjudication. *Id.* ¶ 21. The State contended that the hearsay exception applies to a statement made by any minor and argued that there was no requirement in section 2-18(4)(c) that the minor be named in the petition before his or her statements could be admitted into evidence. *Id.* ¶ 22. Additionally, the public guardian asserted that the Juvenile Court Act provides that evidence of abuse and neglect of one minor is relevant to the abuse and neglect of another minor, regardless of whether the minor is named in the petition. *Id.*

¶ 47    The reviewing court concluded that K.S.'s statements were "encompassed" within the hearsay exception. *Id.* ¶ 26. The court found that section 2-18(4)(c)

> "does not limit the use of 'statements made by the minor' to only those allegations of abuse or neglect directly implicating the minor making the statements or the minor named in the petition, [therefore,] it follows that a minor not named in the petition can offer statements relating to neglect or abuse of another minor, so long as those statements are either corroborated or subject to cross-examination." *Id.*

The appellate court also reasoned that construing the term "the minor" in section 2-18(4)(c) as limited to only those minors named in the petition would render other portions of the Juvenile Court Act superfluous. *Id.* ¶ 28; see 705 ILCS 405/2-18(3) (West 2022) ("In any hearing under this Act, proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible."). Further, the *D.M.* court observed its holding, *i.e.*, that the admission a nonparty minor's statements relating to abuse or neglect of another minor, supported the court's duty to liberally construe the Juvenile Court Act. *D.M.*, 2016 IL App (1st) 152608, ¶ 30 (citing 705 ILCS 405/1-2(4) (West 2012)).

¶ 48    We find this interpretation of section 2-18(4)(c) of the Juvenile Court Act to be well reasoned and applicable in this case. As a minor residing in Angel S.'s home during the timeframe at issue, Taylor T.'s fully corroborated statements from her victim sensitive interview fall within the hearsay exception of section 2-18(4)(c). No error occurred and the trial court properly admitted her statements.

¶ 49    Angel S. also contends that the trial court erred in prohibiting him from impeaching Taylor T.'s credibility during his cross-examination of Panzarella. However, his only citation to

20

the record for this claim occurred during Imelda G.'s cross-examination of Taylor T., not his cross-examination. He further alleges that the trial court prohibited his questioning of Anthony T. about Taylor T's reputation for dishonesty. His only citation to the record does not involve Anthony T.'s testimony and concerned another matter entirely. Moreover, he failed to cite any relevant authority for these claims. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires appellant's brief to include an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." It is well settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155-56 (1990). Thus, defendant has forfeited this argument.

¶ 50    Angel S. next asserts errors related to the admission of the State's group exhibit 3. He initially challenges the admission of the State's "group exhibit 1" but his citation to the record related only to group exhibit 3. He contends that the trial court erred by stating there was "no objection" when the exhibit was admitted, but our reading of the record does not support this contention.

¶ 51    Group exhibit 3 was the set of three photographs taken by Taylor T. and sent to Dil. S. During Dil. S.'s testimony, the prosecutor asked Dil. S. to describe the photographs. Angel S.'s attorney objected based on speculation and foundation, arguing: "There is no possible way in the world that [Dil. S.] could know what was in the dresser or not. She didn't open the dresser. She has no idea what's in the dresser." The trial court then sustained the objection and instructed the prosecutor to rephrase her question. The prosecutor proceeded to ask the witness several more questions to lay a foundation for the admission of the photographs.

¶ 52    In his argument, Angel S. cites to the page in the record where the following exchange took place.

> "THE PROSECUTOR: Judge, at this point I believe that enough foundation has been laid, and I would seek to admit—well, actually, before I do that, I have marked these as a group exhibit.
>
> The first two photos have been testified to that were taken December 14, 2022. There is a third photo taken the next day. So if I could take some testimony about that photo before I move to admit?
>
> THE COURT: Well, no objection. It's allowed."

¶ 53    After asking several additional questions, the prosecutor asked the court to admit the photographs, "I would seek to admit what I have previously marked as People's Group Exhibit 3, which includes three PDF photos, the first two dated December 14, 2022." Angel S.'s attorney then objected to their admission and argued that Dil. S.'s testimony did not lay an appropriate foundation. After arguments from the parties, the trial court admitted the group exhibit, "giving it what legal weight I deem just."

¶ 54    It is clear that the record fails to support Angel S.'s argument. The State was not asking to admit the exhibit at that time asserted by Angel S. The trial court explicitly considered the objections raised to this group exhibit multiple times. Thus, this claim lacks merit.

¶ 55    Angel S. also contends that the admission of group exhibit 3 was error because a proper foundation was not laid for the photographs. The three photographs in this exhibit showed (1) a dresser with burn marks, (2) a clear plastic bag showing white powder, and (3) a handgun in what appeared to be a drawer.

¶ 56    "The requirement of authentication or identification as a condition precedent to

admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ill. R. Evid. 901(a) (eff. Sept. 17, 2019). A proper foundation may be laid by someone having personal knowledge of the photographed object, who can testify that the image is an accurate portrayal of what it purports to show. *In re D.Q.*, 2016 IL App (1st) 160680, ¶ 25. The decision to admit a photograph into evidence is left to the trial court's discretion. *People v. Smith*, 152 Ill. 2d 229, 263 (1992). The trial court has discretion over the admissibility of evidence, and its decision will not be disturbed absent an abuse of that discretion. *In re L.S.*, 2014 IL App (4th) 131119, ¶ 44. An abuse of discretion occurs when the trial court's ruling is fanciful, unreasonable, or when no reasonable person would adopt the trial court's view. *Id.*

¶ 57    All three photographs at issue were taken by Taylor T. and sent to Dil. S. Dil. S. testified to her personal knowledge of the furniture in the photographs. Dil. S. recognized the dresser as a nightstand in respondents' bedroom and saw this nightstand in the bedroom in November 2022. Dil. S. also recognized the second photograph as contents of the same dresser. In the third photograph, Dil. S. identified what she believed to be a gun in a lower drawer of a wardrobe. Dil. S. identified the wardrobe, which was located in the dining room, from when she lived with respondents, and she observed it during her November visit. Following the parties' argument on the admission of these photographs, the trial court admitted the exhibit, "giving it what legal weight I deem just." Since Dil. S. identified the objects in the photographs as being what the State purported, the trial court did not abuse its discretion in admitting the photographs. Moreover, the evidence of cocaine use was clearly established by respondents' own drug test, Angel S.'s admission to the use of other drugs, and D.S.'s hair follicle test showing cocaine exposure.

¶ 58    Angel S.'s final claim of error challenges the admission of both the oral toxicology and

hair follicle tests administered to D.S. Specifically, he argues that (1) the oral toxicology showed an invalid result, (2) Dr. Gummin testified that the oral toxicology test showed a "clear negative," (3) the chain of custody of the hair follicle test was called into question by Dr. Gummin, and (4) it was unclear if the source of D.S.'s exposure was internal consumption or environmental contamination. As previously stated, the admission of evidence is with the discretion of the trial court. *Id.*

¶ 59    Angel S. does not cite any relevant authority to support his argument that both of the toxicology tests were improperly admitted. Again, Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). As pointed out above, it is well settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff*, 194 Ill. App. 3d at 155-56. Accordingly, these claims are forfeited.

¶ 60    Forfeiture aside, no abuse of discretion occurred in the admission of these toxicology tests. Although Dr. Gummin noted some concerns in the chain of custody, he had no reason to "suspect" that the testing was performed on the wrong specimen. He also conceded that he believed the lab "adhered closely" to the guidelines and to best practices in conducting the analysis when the specimen was at the lab. No evidence was presented that the hair follicle specimen was compromised, and any alleged deficiencies in the chain of custody go to the weight, not admissibility, of the evidence. See *People v. Woods*, 214 Ill. 2d 455, 467 (2005) (after the State has established the probability that the evidence was not compromised, and absent any evidence of tampering or substitution, deficiencies in the chain of custody go to the

weight, not admissibility, of the evidence).

¶ 61    As for the rest of the arguments related to the toxicology tests, the trial court heard all the testimony from witnesses, including how to interpret the test results. Nothing in Angel S.'s arguments suggest that the admission was an abuse of discretion. Rather, all of his other arguments regarding the reliability and the results of the tests go only to the weight to be given to the test results, not their admissibility. See *People v. Hutchison*, 2013 IL App (1st) 102332, ¶ 37 ("It is well settled that the credibility of witnesses, the weight of the evidence and the resolution of any conflicts in the evidence are matters for the trier of fact to resolve ***."). Accordingly, no error occurred in the admission of either of the toxicology tests.

¶ 62    Since we have found that none of the complained-of errors had merit, Angel S.'s claim of cumulative error necessarily fails. See *People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984) (finding no cumulative error where the defendant's individual contentions were meritless).

¶ 63    Finally, Angel S. argues that the trial court's dispositional order that it was in D.S.'s best interest to be adjudged a ward of the court was against the manifest weight of the evidence. Specifically, he contends that the court erred in finding he was unable to provide the necessary care for D.S. based on his decision not to participate in the sexual abuse assessment. According to Angel S., there was no credible evidence of sexual abuse to support this assessment and it was error for the trial court to find him unable to provide the necessary care for D.S. Based on his progress with the DCFS recommended services, he maintains that the trial court should have found him fit, willing, and able to care for D.S. The State maintains that the record refutes Angel S.'s claim because he had not completed all of the offered services. The court found that multiple services remained outstanding (such as the sexual abuse assessment), Angel S. had not yet been referred to participate in parenting coaching, and he was still only allowed supervised visitation

with D.S.

¶ 64 Before reaching this argument, we address the guardian's motion to dismiss based on mootness that was taken with the case. On January 28, 2025, the trial court granted Imelda G. full legal custody of D.S., terminated his wardship with DCFS, as well as the order of protective supervision, and closed the case. The court also ordered that Angel S. was to remain out of the home until his criminal cases, listed as case Nos. 24-CR-0294001, 24-CR-0294101, 23-DV-7139201, and 23-DV-7138601, were resolved. As a result, the guardian asserts that the July 30, 2024, dispositional order at issue has been rendered moot by this January 28, 2025, order. The guardian argues that this court lost jurisdiction over the initial dispositional order when the child protection case was closed with full custody restored to Imelda G. The guardian further argues that even if this court reviewed the July 30, 2024, dispositional order, we cannot grant the relief requested by Angel S. because custody has already been determined.

¶ 65 The purpose of the Juvenile Court Act is to secure for a minor the "care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor," to "preserve and strengthen the minor's family ties whenever possible," and to "remov[e] him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." 705 ILCS 405/1-2(1) (West 2022). The Juvenile Court Act further provides that the court and parties in neglect and abuse proceedings should "act in a just and speedy manner to determine the best interests of the minor." *Id.* § 2-14(a).

¶ 66 After disposition, the trial court maintains jurisdiction and may modify the dispositional order at any time until the case is finally closed or the child reaches majority. *In re Desiree O.*, 381 Ill. App. 3d 854, 864 (2008) (citing 705 ILCS 405/2-23(2) (West 2006)). Stated differently,

the trial court loses jurisdiction on the initial dispositional order or the underlying finding of abuse or neglect while on appeal, but it retains jurisdiction to enter a new dispositional order in light of changed circumstances. See *In re Rayshawn H.*, 2014 IL App (1st) 132178, ¶ 39 (finding the mother's appeal of the disposition order moot when the trial court subsequently modified the order to return the minor to the mother's custody).

¶ 67    An appeal becomes moot where events occurring after the filing of the appeal render it impossible for the reviewing court to grant effectual relief to the complaining party. *In re Shelby R.*, 2013 IL 114994, ¶ 15. "As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). This court may take judicial notice of events which, while not appearing in the record, disclose that an actual controversy no longer exists, rendering the issue before the court moot. *In re Andrea F.*, 208 Ill. 2d 148, 156 (2003).

¶ 68    We agree with the guardian. Following the closure of the child protection case, the question of whether the trial court erred in its July 30, 2024, decision to adjudge D.S. a ward of the court has been rendered moot. See *Rayshawn H.*, 2014 IL App (1st) 132178, ¶ 39. As a result, even if we found the trial court's ruling was in error, which we have not found, we are unable to grant Angel S. any effectual relief because the case has been closed under the subsequent January 28, 2025, order.

¶ 69    Angel S. does not contest that the issue has been rendered moot, nor does he deny that he has four pending criminal cases as listed in the January 28, 2025, order. Instead, he argues that this court should review his claim under an exception to the mootness doctrine and refers to both the public interest and the capable of repetition yet avoiding review exceptions.

¶ 70    The public interest exception requires a clear showing of each of the following criteria: (1) the question presented is of a public nature, (2) an authoritative determination of the question is desirable for the future guidance of public officers, and (3) the question is likely to recur. *Shelby R.*, 2013 IL 114994, ¶ 16. This exception is construed narrowly and a clear showing of each element is required. *In re Adoption of Walgreen*, 186 Ill. 2d 362, 365 (1999).

¶ 71    Here, Angel S. has challenged the trial court's factual findings following the disposition hearing as against the manifest weight of the evidence. However, sufficiency of the evidence claims are inherently case-specific reviews and do not present the kinds of broad public interest issues necessary to meet the requirements for this exception. *Alfred H.H.*, 233 Ill. 2d at 356-57. Accordingly, Angel S.'s claim does not fall within the public interest exception to the mootness doctrine.

¶ 72    The capable of repetition exception requires (1) the challenged action must be of a duration too short to be fully litigated prior to its cessation and (2) there must be a reasonable expectation that the same complaining party would be subjected to the same action again. *Id.* at 358. Even if we assume that the first prong was satisfied, Angel S. cannot meet the burden of the second prong. Again, because Angel S. is challenging the sufficiency of the evidence presented at the disposition hearing, "[t]here is no clear indication of how a resolution of this issue could be of use to [him] in future litigation." *Id.* at 360. Therefore, the requirements for the capable of repetition yet avoiding review exception have not been met. Since Angel S.'s claim does not fall within an exception, his claim is barred under the mootness doctrine.

¶ 73    Based on the foregoing reasons, we dismiss Angel S.'s challenge to the circuit court's dispositional order and affirm all other orders entered by the circuit court of Cook County.

¶ 74    Affirmed in part and dismissed in part.

*In re D.S.*, 2025 IL App (1st) 241635

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-JA-928; the Hon. Shannon P. O'Malley, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant Imelda G. <br><br> E. Madeline O'Neill, of Chicago, for other appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John Nowak, Gina DiVito, and Marina Para, Assistant State's Attorneys, of counsel), for the People. <br><br> Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Carrie Fung, and Juliane Johnson, of counsel), for other appellee. |